PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ULRICH G. BADER,
            *Petitioner-Appellee,*

v.                                          No. 06-2259

SONJA KRAMER,
            *Respondent-Appellant.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Senior District Judge.
(1:04-cv-00375-CMH)

Argued: March 13, 2007

Decided: April 18, 2007

Before SHEDD and DUNCAN, Circuit Judges, and
Samuel G. WILSON, United States District Judge for the
Western District of Virginia, sitting by designation.

---

Affirmed by published opinion. Judge Shedd wrote the opinion, in
which Judge Duncan and Judge Wilson joined.

---

**COUNSEL**

**ARGUED:** Laurence James Tracy, Falls Church, Virginia, for Appel-
lant. Michael Alexander Johnson, ARNOLD & PORTER, L.L.P.,
Washington, D.C., for Appellee. **ON BRIEF:** Thomas Holsten,
ARNOLD & PORTER, L.L.P., Washington, D.C., for Appellee.

**OPINION**

SHEDD, Circuit Judge:

Ulrich Bader filed this petition under the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601 *et seq.*, seeking the return of his daughter ("C.J.B.") to Germany. Bader alleged that his ex-wife, Sonja Kramer, violated the Hague Convention on Civil Aspects of Child Abduction ("Hague Convention"), Oct. 25, 1980, T.I.A.S. No. 11,670, 19 I.L.M. 1501, by taking C.J.B. to live in the United States. The district court ruled in Bader's favor and ordered C.J.B. returned to Germany. For the reasons that follow, we affirm the judgment of the district court.

I

Under the Hague Convention, to secure the return of an abducted child, a petitioner must prove by a preponderance of the evidence that "the child has been wrongfully removed" within the meaning of the Convention. 42 U.S.C. § 11603(e)(1). A petitioner can establish that the removal of a child is "wrongful" where: (1) the child was "habitually resident" in the petitioner's country of residence at the time of removal, (2) the removal was in breach of the petitioner's custody rights under the law of his home state, and (3) the petitioner had been exercising those rights at the time of removal. *Humphrey v. Humphrey*, 434 F.3d 243, 246 (4th Cir. 2006).

Upon a showing of wrongful removal, return of the child is required unless the respondent establishes one of four defenses. *Miller v. Miller*, 240 F.3d 392, 398 (4th Cir. 2001). Two of the defenses must be supported by clear and convincing evidence: (1) that return would expose the child to a "grave risk" of "physical or psychological harm or otherwise place [the child] in an intolerable situation" and (2) that return of the child would not be permitted by "fundamental principles of the United States relating to the protection of human rights and fundamental freedoms." *Id.* (internal quotations omitted). The other two defenses may be supported by a preponderance of the evidence: (1) that the petition for return was not filed within one year of the removal and the child is now well-settled in another country, and (2) that the petitioner was not actually exercising his custodial rights

at the time of the removal or had consented to or acquiesced in the removal. *Id.* at 399.

In an action under ICARA and the Hague Convention, we review the district court's findings of fact for clear error; we review *de novo* its conclusions regarding principles of domestic, foreign, and international law. *Id.*

II

Bader is a citizen of Germany, and Kramer is a dual citizen of Germany and the United States. Bader and Kramer were married in Germany in 1998. Their only child, C.J.B., was born in 1999 in Germany. From the date of C.J.B.'s birth until Kramer left Germany on April 4, 2003, Bader, Kramer, and C.J.B. all resided continuously in Germany.

In August 2000, Bader and Kramer separated. At all times after the separation, C.J.B. resided with Kramer. Kramer was the sole source of financial support for C.J.B.

In November 2000, while employed as a foreman at a United States Army Munitions Depot, Bader was arrested for violations of the War Weapons Control Act and the Explosives Act. Bader was ultimately convicted of unauthorized transfer of the actual control of war weapons, unauthorized transportation of war weapons, and unauthorized handling of explosive substances. A German court sentenced him to a term of 42 months of incarceration and suspended his driving privileges.

During Bader's incarceration, C.J.B. continued to reside with Kramer and was supported by her. Bader received visits from C.J.B. accompanied by Kramer during the first six months of his incarceration.

Bader and Kramer were legally divorced in June 2002. C.J.B. continued to reside with Kramer and was supported financially by her subsequent to the divorce.

Bader was released from prison on December 17, 2002, and was placed on probation for a period of three years. That same day, Kramer and C.J.B. traveled to the United States with Bader's consent. They returned to Germany on January 3, 2003.

On January 9, 2003, Bader picked up C.J.B. from her school for an eight-day family ski vacation. On January 16, 2003, Kramer filed a petition in a German court seeking sole custody, and on February 6, 2003, Bader filed a petition seeking sole custody. On March 20, 2003, the German court ruled on the petitions, setting forth a visitation schedule for Bader and granting Kramer an award of child support in the amount of 177 euros per month.

On April 4, 2003, Kramer picked up C.J.B. from Bader's home and traveled with her to the United States. Kramer did not inform Bader of her intent to do so, and she did not have his consent. Kramer and C.J.B. have remained in the United States since that date.

In Germany, Bader filed a petition for sole custody in June 2003. In October 2003, Bader filed a Request for Return of Child under the Hague Convention with the Central Authority of Germany. The German Central Authority sent a letter to the American Central Authority in November 2003 stating that when Bader and Kramer "were divorced, no decision about the rights of custody was issued. So both still have parental responsibility for the child pursuant to Section 1626 of the German Civil Code (BGB)." J.A. 127-28. A German court granted Bader sole custody in an order dated December 4, 2003.

Bader then filed this petition in the district court under the Hague Convention. Initially, the district court denied Bader any relief on his petition after finding that he did not have cognizable rights of custody under the Hague Convention. Bader appealed, and we reversed, holding that, under German law, Bader possessed joint custody rights to C.J.B. *Bader v. Kramer*, 445 F.3d 346, 351 (4th Cir. 2006) ("*Bader I*"). This was so because German law vests both parents with joint custody of a child until a competent court enters a contrary order. *Id.* at 350. We then remanded the case to the district court for a determination as to whether Bader was exercising his custody rights at the time of C.J.B.'s removal and whether any defenses apply under the Hague Convention. On remand, the district court found that Bader

was actually exercising his custody rights and that no defenses precluded C.J.B.'s return to Germany. Consequently, the district court ordered C.J.B. returned to Germany. Kramer now appeals.

## III

*Bader I* established that C.J.B.'s removal from Germany was in breach of Bader's custody rights under German law. Therefore, on remand, the only questions before the district court were whether Bader was actually exercising his custody rights at the time of C.J.B.'s removal and whether Kramer has established any defense precluding C.J.B.'s return to Germany. Kramer's appeal now brings these issues before us.

### A.

We first consider whether Bader was actually exercising his custody rights to C.J.B. at the time of her removal from Germany. As we noted earlier, a showing of actual exercise is a necessary element of a claim of wrongful removal under the Hague Convention. *Humphrey*, 434 F.3d at 246. Despite this requirement, the Hague Convention does not define *exercise*. Therefore, an initial issue we face is what *exercise* means in the context of the Hague Convention. In other words, we must decide what conduct by a parent possessing custody rights is sufficient to show that he actually exercised those rights.

As other circuits have noted, this inquiry raises several serious concerns. *See, e.g., Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 344-45 (5th Cir. 2004); *Friedrich v. Friedrich*, 78 F.3d 1060, 1065 (6th Cir. 1996). First, it requires us either to adopt a definition of *exercise* which is drawn from that term's plain and ordinary meaning or to delve into the domestic law of the country of habitual residence in search of a meaning. Each approach is problematic. The former would require us to adopt some sort of "common law definition" of *exercise*, *Friedrich*, 78 F.3d at 1065, a definition potentially divorced from that term's meaning in the law of the country of habitual residence; and the latter is an undertaking for which we are particularly ill-suited, it requiring a determination of "policy-oriented decisions concerning the application of" another country's domestic law, *id.* Second, an inquiry into the exercise of custody rights pushes us

toward a consideration of whether "a parent's custody rights should be ignored because he or she was not acting sufficiently like a custodial parent." *Id.* This would move us perilously close to a determination on the merits of the parent's underlying custody claim — a determination which is reserved for the courts of the country of habitual residence. *Cantor v. Cohen*, 442 F.3d 196, 199 (4th Cir. 2006); Hague Convention art. 19. Third,

> [T]he confusing dynamics of quarrels and informal separations make it difficult to assess adequately the acts and motivations of a parent. An occasional visit may be all that is available to someone left, by the vagaries of marital discord, temporarily without the child. Often the child may be avoided, not out of a desire to relinquish the custody, but out of anger, pride, embarrassment, or fear, vis-a-vis the other parent. Reading too much into a parent's behavior during these difficult times could be inaccurate and unfair.

*Friedrich*, 78 F.3d at 1065-66 (footnote omitted).

In light of these concerns, we find persuasive the nearly-universal approach taken by courts faced with the question of the exercise of custody rights, and we adopt it here. Accordingly, we will "liberally find 'exercise' whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." *Id.* at 1065; *see also Sealed Appellant*, 394 F.3d at 344-45; *Baxter v. Baxter*, 423 F.3d 363, 370 (3d Cir. 2005). This avoids the need to distinguish between *de jure* custody and *de facto* custody, thus obviating the concerns outlined above. Under this approach,

> a person [who] has valid custody rights to a child under the law of the country of the child's habitual residence . . . cannot fail to "exercise" those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child.

*Friedrich*, 78 F.3d at 1066. Further, "[o]nce it determines the parent exercised custody rights in any manner, the court should stop — com-

pletely avoiding the question whether the parent exercised the custody rights well or badly." *Id.*[1]

### B.

With these principles in mind, we have no difficulty affirming the district court's finding that Bader exercised his right to joint custody here. During the three months between his release from prison and C.J.B.'s removal, Bader had actual physical custody of C.J.B. on at least three occasions: a December 14-16 visit, a January ski vacation, and an April overnight stay. In fact, C.J.B. had spent the night with Bader and was at his residence when Kramer picked her up just prior to taking her to the United States. In addition, Bader paid child support to Kramer when ordered to do so and financially supported C.J.B. during the times when she was in his custody. While any one of these facts might suffice to establish that Bader did not clearly and unequivocally abandon C.J.B., their aggregation certainly does so, leading to the conclusion that Bader actually exercised his custody rights under the Hague Convention.

Notwithstanding this, Kramer maintains that, in order to establish that he was exercising his rights of custody, Bader had to "place the child in a city, suburb, or countryside; in a particular dwelling unit at some address" or provide primary care for the child. Appellant's Br. 13. Thus, while recognizing that Bader retained the legal right to custody of C.J.B., Kramer argues that he actually exercised merely a right of access or visitation. This argument, however, requires us to engage in the exact analysis which the unequivocal abandonment standard forbids: a determination of whether Bader acted "sufficiently like a custodial parent" under German law. *Friedrich*, 78 F.3d at 1065. Of course, this analysis would, in turn, raise all the concerns which we earlier noted and which the unequivocal abandonment stan-

---

[1]Of course, this approach will not apply when the country of habitual residence, by law, expressly defines the exercise of custody rights for purposes of the Hague Convention. *Friedrich*, 78 F.3d at 1066 n.6. Similarly, when a competent judicial tribunal in the country of habitual residence has made a determination as to whether a parent was exercising his custody rights, that determination will normally be conclusive. *Id.* at 1065.

dard avoids. Having rejected this approach earlier in this opinion, we cannot accept Kramer's argument now. Because Bader did not unequivocally abandon C.J.B., he necessarily exercised his joint custody rights regardless of whether he determined C.J.B.'s place of residence or provided primary care.

## C.

We next consider whether Kramer has established any defense under the Hague Convention which precludes the return of C.J.B. to Germany. On appeal, Kramer's sole assertion in this regard is that the district court erred in failing to consider her defense under Article 13(a) of the Hague Convention.[2] Article 13(a) provides that a child may not be returned if the removing parent proves, by a preponderance of the evidence, that the petitioner was not actually exercising his custodial rights at the time of the removal or had consented to or acquiesced in the removal. *Miller*, 240 F.3d at 399. This defense, though, merely represents the converse of what Bader was required to prove to succeed on his claim that the child should be returned. Because the district court found that Bader "sufficiently exercised his custody right over C.J.B. to satisfy the third prong of the Convention," J.A. 1055, it necessarily rejected Kramer's Article 13(a) defense even if it did not expressly do so. Therefore, we find no merit to Kramer's contention that the case should be remanded for a consideration of this defense.

## IV

In sum, as Bader has established, pursuant to the Hague Convention and ICARA, that C.J.B. was wrongfully removed from Germany and as no defense precludes her return, C.J.B. must be promptly returned to Germany. Accordingly, the judgment of the district court is

*AFFIRMED.*

---

[2]In the district court, Kramer apparently asserted a defense under Hague Convention Article 13(b), *i.e.* returning C.J.B. to Germany would pose a grave risk of physical or psychological harm. However, Kramer failed to raise this defense on appeal, waiving any further consideration of it. *Edwards v. City of Goldsboro*, 178 F.3d 231, 241 n.6 (4th Cir. 1999).