**Marco KREFTER, Petitioner,**

v.

**Pamela C. WILLS, Respondent.**

**Civil Action No. 08–11689–PBS.**

United States District Court,
D. Massachusetts.

May 29, 2009.

---

Peter B. Krupp, Lurie and Krupp, LLP, Boston, MA, for Respondent.

Harold N. Robertson, Harmon & Robertson, P.C., Westport, MA, for Petitioner.

### *MEMORANDUM AND ORDER*

SARIS, District Judge.

## *I. INTRODUCTION*

Petitioner Marco Krefter seeks return of his daughter pursuant to the provisions of the Hague Convention on the Civil Aspects of International Child Abduction and implementing federal legislation. Petitioner asserts that Respondent, Pamela C. Wills, his former wife and mother of his child, C.K., now age eight, removed the child from Germany to the United States without his knowledge or consent and in contravention of his custody rights. Although petitioner does not seek physical custody of C.K., he does seek the adjudication of custodial terms in Germany.

Ms. Wills, who is indigent,[1] asserts that under the Hague Convention, the Court should not return the child to Germany because (1) Mr. Krefter was not actually exercising his custody rights at the time of removal in October 2007, and (2) due to Ms. Wills' dire financial situation and other factors, there is a grave risk that the return of the child would cause her physical or psychological harm or place her in an intolerable situation. After an evidentiary hearing spanning four days and review of pre- and post-hearing submissions,

---

1. The Court appointed counsel who served in a pro bono capacity.

the petition is ***ALLOWED*** subject to certain undertakings.

## II. FINDINGS OF FACT

### A. Marriage

Mr. Krefter, a German citizen, and Ms. Wills, an American citizen, first met in 1990. Six months later, Ms. Wills moved to Germany to be with Mr. Krefter, and in 1994, the two were married in a civil ceremony in Germany.[2] The couple resided together in Germany, though they spent significant amounts of time in the United States. They maintained a residence (either owning or renting) in the States continuously from the late 1990s through 2005 and started two companies in Massachusetts, where Ms. Wills' family resides.

In December 2000, C.K. was born. All three lived together in Hamburg, Germany. The family continued to visit the United States regularly, approximately three times per year. Ms. Wills spent the summers with C.K. on Cape Cod in Mashpee, Massachusetts, where Ms. Wills' family resides (with Mr. Krefter joining them for part of the summer vacation).

From her arrival in Germany in 1991 through approximately 1997, Ms. Wills held jobs with the United States military and two separate companies in Germany. In 1997, Ms. Wills and Mr. Krefter started a paint distribution company in Mashpee, Massachusetts. Though Mr. Krefter retained control of the company, Ms. Wills and several of her family members constituted the company's work force. This company was followed by another in which Ms. Wills also played a role. Besides her roles in these two companies, and her occasional "support" of Mr. Krefter (a self-described international business consultant) in his work, Ms. Wills did not work outside the home after 1997. Ms. Wills knew little about either the nature of Mr. Krefter's work or the family's finances, as Mr. Krefter exclusively handled all such matters.

By all accounts, before their daughter was born, the couple lived a busy, trans-Atlantic lifestyle. Even after C.K. was born, they lived in a very sizable apartment in Hamburg, owned or rented property in the United States, and traveled frequently. Mr. Krefter insisted on having only the best, even in times when, in Ms. Wills' view, money seemed tight. Ms. Wills never knew the details of where the money was coming from, though she states that Mr. Krefter always talked as if there was a deal in the works with a promise of a big payment in the future.

### B. Separation & Finances

In August 2005, Ms. Wills and Mr. Krefter separated. Ms. Wills made the decision to leave Mr. Krefter after three years of fights, many of which occurred in front of their daughter. The couple never went to the German courts to arrange for orders of child support or visitation rights.

Initially, Mr. Krefter moved out of the apartment the family had been renting, while Ms. Wills remained with C.K. The family apartment was quite large and cost 2,300 Euros per month "cold," meaning without utilities. After just a few months, Ms. Wills and C.K. "downsized," and moved into a smaller and cheaper apartment, also in Hamburg (located at Wuestenkamp 5). (Resp't Ex. 13.) The rent for this apartment was 850 Euros "cold." Even at this lower rate, however, Ms. Wills had trouble making ends meet.

Having been out of the work force for a long time, Ms. Wills asked Mr. Krefter to help her financially until she was able to

---

**2.** The couple had a church ceremony in Ireland in 1996.

get on her feet, and he agreed. Ms. Wills began teaching tap dance lessons, but even in good months, was only able to bring in approximately 400 Euros, only half of a month's rent. In early 2007, Ms. Wills began teaching English to business executives through an agency, eventually acquiring a regular schedule of three classes per week. Her need to be available for C.K. in the afternoons and evenings, however, limited her ability to teach. In her best month (May 2007), Ms. Wills earned 1,000 Euros from both jobs. A more typical monthly income was 650 or 700 Euros.

In August 2007, Ms. Wills learned that her earning potential was limited in another way. In 2000, Ms. Wills had, at Mr. Krefter's urging for tax reasons, changed her residence to Mashpee, Massachusetts. Seven years later, when Ms. Wills went to renew her work permit with the German authorities, she discovered that, because she had not been listed as a German resident, she was now only eligible for a work permit with substantial restrictions. According to Ms. Wills, this severely limited her ability to work as a freelance teacher at the language agency. Were Ms. Wills able to have her husband (she and Mr. Krefter were not then legally divorced) vouch that he could support her, she would be eligible for a less restrictive permit. Though Mr. Krefter agreed to go with Ms. Wills to a meeting with the authorities for this purpose, he did not show up and Ms. Wills was therefore unable to acquire the less restrictive work permit.

According to Ms. Wills, after they separated in 2005, Mr. Krefter did provide her with some financial payments, but they varied dramatically in both the amount of the payments and their timing.[3] In late 2006, Mr. Krefter and Ms. Wills agreed that he would pay 810 Euros per month in child support. With the exception of the month of March (when he paid only 250 Euros), Mr. Krefter fulfilled this agreement from January through June 2007. (Resp't Ex. 11; Resp't Post–Hr'g Mem. 9.) However, Mr. Krefter made no child support payments in July 2007, paid 120 Euros in August 2007, and has paid only 250 Euros each month *thereafter* (*through the time of hearing*). (*Id.*)

Ms. Wills constantly struggled to pay the bills. In the summer of 2007, Ms. Wills and C.K. moved again, this time to an even cheaper apartment (approximately 550 Euros per month). (Resp't Ex. 14.) In order to secure this apartment, however, Ms. Wills had to seek assistance from Mr. Krefter and his girlfriend, Ms. Silva–Rodriguez. In June 2007, Ms. Silva–Rodriguez provided 1,500 Euros for the security deposit (and possibly first month's rent) on the apartment. Because of this payment, Mr. Krefter believed he was justified in not paying child support in July and paying only 120 Euros in child support for the month of August. Ms. Wills, however, had never agreed to forfeit child support payments in exchange for this payment.

To make matters worse, in early 2007, several of Mr. Krefter's creditors began hounding Ms. Wills. First, C.K.'s former babysitter filed a lawsuit for wages she was owed. According to Ms. Wills, the German court ultimately determined that Mr. Krefter, not Ms. Wills, was responsible for the approximately 3,500 Euros owed to the babysitter. In addition, Mr. Krefter's former landlord began calling or e-mailing Ms. Wills on a weekly basis, demanding that she help secure the 15,000 Euros that Mr. Krefter supposedly owed

---

**3.** In addition, Mr. Krefter originally insisted that he pay Ms. Wills in cash, often while meeting on a street corner. However, in the fall of 2006, Mr. Krefter began depositing the money directly into her account.

to him. According to Ms. Wills, the landlord stated that he would prefer that Mr. Krefter, not Ms. Wills, pay him, but that because Mr. Krefter consistently avoided him and failed to make promised payments, the landlord felt he had little choice but to pressure her as well. Ms. Wills states that, at one point, officers of the court arrived at her residence, seeking to determine whether she had any possessions that could be used to repay the debt.

Throughout this time, Ms. Wills wrote several e-mails to Mr. Krefter relaying her experiences with these creditors and expressing great concern about the impact his financial situation *was having on her and C.K.* (*See, e.g.,* Resp't Exs. 6–10 (emails from January through March 2007)). On January 20, 2007, Ms. Wills wrote to Mr. Krefter, "continuing to live in Germany with so many outstanding debts is not an option for me. I will not be able to survive." (Resp't Ex. 6.)

## C. Visitation

In the first months after their separation (fall of 2005), Mr. Krefter would visit C.K. in the evenings at the family apartment and call to say good night to C.K. fairly often. In early 2006, Mr. Krefter took C.K. for overnight visits. During this time, Ms. Wills did not know where Mr. Krefter lived, as he refused to tell her. She only learned that Mr. Krefter was living with his girlfriend when C.K. showed Ms. Wills where Mr. Krefter took her when they visited outside of Ms. Wills' apartment.

The relationship grew rockier in 2007. Mr. Krefter's visits with C.K. were sporadic as the couple sparred over money issues. In January 2007, Mr. Krefter canceled his pre-arranged visit with C.K.; in Ms. Wills' view, Mr. Krefter did so because she (Ms. Wills) had not acquiesced to some demand that Mr. Krefter had made of her (a tactic she states he repeatedly employed). After Mr. Krefter dropped out of contact for six weeks after this incident, Ms. Wills informed him that she would no longer let him see C.K. alone, claiming that he was mentally unstable and that his inconsistent behavior was harmful to C.K. She insisted he could only visit C.K. at her apartment while she was present. He refused.

In March 2007, though, C.K. spent a two-week vacation with Mr. Krefter's parents. From April through mid-June 2007, Mr. Krefter again saw C.K. regularly, taking her for overnight visits which, according to Ms. Wills, were always either with his girlfriend or family. During this time, Mr. Krefter visited with C.K. seven times (in addition to any times he may have seen C.K. during her stay with his parents in March).

On June 23, 2007, however, there was a game-changing incident. According to Ms. Wills, Mr. Krefter was scheduled to have C.K. for both Friday and Saturday evenings that weekend. On Friday night, though, C.K. ended up sleeping over at a friend's house. On Saturday morning, Ms. Wills picked up C.K. from the friend's house and brought her back to Ms. Wills' apartment, where Mr. Krefter was to pick her up that morning. When Mr. Krefter arrived late to pick up C.K., Ms. Wills confronted him about his tardiness; Mr. Krefter got angry and stormed out of the apartment, with C.K.'s bag in his hand. Ms. Wills shut the door behind Mr. Krefter, saying that she would not let C.K. go with him while he was in such an enraged state. She asked him to come back to talk calmly. C.K. was calling for him to come back as well, but he did not. Instead, he left her bag beside the door and went outside. Ms. Wills' boyfriend, present this entire time, went outside after him. Mr. Krefter and Ms. Wills' boyfriend had some level of an altercation (including a verbal

insult from Ms. Wills' boyfriend to Mr. Krefter) and Mr. Krefter left. According to Ms. Wills, C.K. was devastated by this incident.

Not long after the incident in June 2007, Ms. Wills traveled to the United States with C.K. for summer vacation with Ms. Wills' family on Cape Cod. Mr. Krefter asserts that he did not want C.K. to go, and that he was particularly upset when Ms. Wills told him that she and C.K. would have to leave for the United States on his birthday (June 29). Ms. Wills contends that prior to the "blow-up" at her apartment, Mr. Krefter had consented to (and even encouraged) the plan for C.K. to spend much of the summer on the Cape. It was only after the June incident that he suddenly objected. Mr. Krefter declined Ms. Wills' offer to have C.K. stay with him the entire summer instead of going to Massachusetts. Ms. Wills and C.K. returned from the Cape in mid-August that year.

Mr. Krefter did not attempt to arrange any visits with C.K. when she returned. On one occasion, however, Mr. Krefter was waiting for C.K. along the route she walked home from school. He approached her and spoke with her, leaving C.K.—who had not seen him since the explosive incident in June—a bit "unnerved" according to Ms. Wills. Mr. Krefter attended a parents night at C.K.'s school during this period.

## D. Removal

Ms. Wills' financial situation remained dire upon her return to Germany at the end of the summer in 2007. The creditors continued to pursue Ms. Wills over Mr. Krefter's debts, and she was still having trouble making ends meet. Mr. Krefter paid only 120 Euros of support in August, 250 Euros in September, and 250 Euros at the beginning of October. On October 5, 2007, Ms. Wills moved out of her German apartment and returned, with C.K., to her parents' home in Mashpee, Massachusetts. She did not give advance notice to Mr. Krefter, and he never gave consent for the removal. Two days later (October 7, 2007), Ms. Wills e-mailed Mr. Krefter informing him that she and C.K. had gone to Massachusetts because she was unable to cover even her and C.K.'s "most basic living expenses." (Resp't Ex. 20.) Ms Wills explained that the lack of reliable child support from Mr. Krefter and her inability to qualify for financial support or an unrestricted work permit from the German government because of her residency status had forced her to leave. She never sought assistance from the German courts.

Mr. Krefter maintains that he tried on many occasions to speak over the phone with C.K. after her move to the United States in October 2007, but that Ms. Wills or her family generally denied him that opportunity. Ms. Wills, though, states that in the first few months after she and C.K. moved to Mashpee (October 2007—December 2007), Mr. Krefter called approximately one time per week and was usually given the chance to talk with C.K. Then, in January 2008, after Ms. Wills learned about legal proceedings Mr. Krefter had filed against her in Germany, she stopped allowing Mr. Krefter to speak with C.K. when he called.

At the end of November 2008, over one year since he had last seen C.K., Mr. Krefter spent several days on Cape Cod in Massachusetts and New York City. Although he was staying in the nearby town of North Falmouth for several days while on the Cape, Mr. Krefter did not attempt to call or arrange a visit with C.K. Instead, one day during his stay, he drove by the bus stop where Ms. Wills and C.K. were waiting, honked the horn, waved, and drove off. Also during this stay, Mr.

Krefter mailed a package to C.K. The package was not signed by Mr. Krefter, but rather had a return address in Mashpee with "Santa Claus" listed as the sender. The package, according to Mr. Krefter, was part of the German tradition where children receive gifts on December 6th.

Prior to Ms. Wills' departure to the United States with C.K., in late August or early September 2007, Mr. Krefter had filed for divorce in Germany. One year later, in September 2008, a divorce proceeding was held in Germany; Ms. Wills did not attend though she had been served with the divorce papers. The German court finalized the divorce on September 30, 2008, but did not make any custody determination.[4]

As for the present situation, by all accounts, C.K. has adjusted well to school and life in Mashpee. Ms. Wills remains in a dire financial situation. She resides with her parents in Mashpee and has declared bankruptcy. She makes at most $300 per week from a telemarketing job and has less than $1,000 in the bank. Since the final day of hearing in this case near the end of March 2009, Mr. Krefter has not paid any child support for C.K. (Wills Aff. ¶ 2) (Docket No. 29, Ex. 2.)

### E. Procedural History

Mr. Krefter filed the petition with this court on October 2, 2008, nearly one year after C.K.'s departure from Germany. The petition was accompanied by a motion requesting an expeditious *evidentiary hearing.* (*See* Docket Nos. 1–2.) On October 21, 2008, this Court held a hearing at which Ms. Wills requested appointment of counsel. The Court appointed counsel to Ms. Wills the next day. On December 15, 2008, the Court began the evidentiary hearing. A second day of hearings was scheduled for January 12, 2009. In early January, Mr. Krefter moved to *continue the hearing until February or March.* (*See* Docket No. 10.) The Court granted the motion to continue and held evidentiary hearings on March 19, March 20, and March 23, dates agreed to by both parties. On March 23 and March 24, the parties attempted to mediate the case before a magistrate judge. These efforts failed. Both parties requested the opportunity to file post-hearing briefs, which were filed in April 2009.

Mr. Krefter has stated that he does not seek exclusive physical custody of C.K. Rather, he seeks only that she return to Germany for custodial proceedings.

### III. DISCUSSION

The Hague Convention aims to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 19 I.L.M. 1501 ("Hague Convention" or "Convention"). In the United States, the Hague Convention is implemented by the International Child Abduction Remedies Act ("*ICARA*"). *See* 42 U.S.C. §§ 11601–11611. Two important principles underlie the Hague Convention:

> First, a district court deciding a petition for return of a child has jurisdiction to decide the merits of the wrongful removal claim, but it may not decide the merits of the underlying custody dispute. Second, the Hague Convention is generally intended to restore the pre-removal

---

4. At the hearing, Ms. Wills' counsel represented that there is also an order in Massachusetts state court granting temporary custody to Ms. Wills.

status quo and to discourage a parent from engaging in international forum shopping.

*Kufner v. Kufner*, 519 F.3d 33, 38 (1st Cir.2008) (citations omitted).

▮ To succeed in a petition for the return of a child under the Hague Convention, a petitioner must establish by a preponderance of the evidence that the child was "wrongfully removed or retained within the meaning of the Convention." 42 U.S.C. § 11603(e)(1). A removal or retention is wrongful when:

> (a) it is in breach of rights of custody attributed to a person . . . either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> (b) at the time of the removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

*Kufner*, 519 F.3d at 39 (quoting Hague Convention, art. 3). If the petitioner demonstrates that a child has been wrongfully removed or retained within the meaning of the Convention, the child is to be returned promptly unless one of four exceptions applies. *Whallon v. Lynn*, 230 F.3d 450, 454 (1st Cir.2000) (citing 42 U.S.C. § 11601(a)(4)).

The concept of "actual exercise" appears two times in the Convention. First, in order to meet his burden of demonstrating that the removal was in fact "wrongful," a petitioner must establish that his rights of custody were "actually exercised" at the time of removal, or that, but for the removal, they would have been exercised. Hague Convention, art. 3. Second, Article 13 of the Convention, which details three of the four exceptions to the general rule that a "wrongfully removed" child should be returned, states:

> [T]he judicial or administrative authority of the requested State is not bound to order the return of the child if the person . . . oppos[ing] its return establishes that . . . the person . . . having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention. . . .

Hague Convention, art. 13.

Both parties agree that Germany qualifies as C.K.'s habitual residence under the Convention and that, under German law, Mr. *Krefter and Ms. Wills jointly held custody rights to C.K. See Kufner*, 519 F.3d at 39 ("Under German law, where parents are married at the birth of the child, they have joint custody over the child until the operation of law . . . or a court order terminates joint custody."). Thus, with respect to the initial determination as to whether the removal was "wrongful," the sole issue is whether Mr. Krefter has proven that he was exercising or would have exercised his custody rights but for the removal.

## A. Actual Exercise

Ms. Wills argues that Mr. Krefter has not proven by a preponderance of the evidence that, at the time of her removal of C.K. from Germany in October 2007, he was actually exercising his rights of custody.

Despite the fact that "a showing of 'actual exercise' is a necessary element of a claim for wrongful removal under the Hague Convention," the Convention itself does not define the term. *Bader v. Kramer*, 484 F.3d 666, 670 (4th Cir.2007). It thus falls to courts to determine "what conduct by a parent possessing custody rights is sufficient to show that he actually exercised *those rights*." *Id.*; *see generally* Hague Convention, art. 5 (" '[R]ights of custody' shall include rights relating to the

care of the person of the child and, in particular, the right to determine the child's place of residence."). Courts have recognized that wrongful removal claims often arise amidst "confusing dynamics of quarrels and informal separations [which] make it difficult to assess adequately the acts and motivations *of a parent.*" *Bader,* 484 F.3d at 671 (*quoting Friedrich v. Friedrich,* 78 F.3d 1060, 1065 (6th Cir. 1996) (*Friedrich II*)). "Reading too much into a parent's behavior during these difficult *times could be inaccurate and unfair." Id.*

The Sixth Circuit has concluded that only "acts that constitute clear and unequivocal abandonment of the child" can cause a person with valid custody rights to be deemed as having failed to "exercise" those rights under the Hague Convention. *Friedrich II,* 78 F.3d at 1066. Most American courts confronting a dispute involving the "actual exercise" prong have followed *this approach outlined in Friedrich II. See, e.g., Bader,* 484 F.3d at 671 (characterizing this approach as "nearly-universal" *and adopting the standard*); *Baxter v. Baxter,* 423 F.3d 363, 370 (3d Cir.2005) (stating that the test for finding non-exercise is *"stringent"*); *Sealed Appellant v. Sealed Appellee,* 394 F.3d 338, 345 (5th Cir.2004) ("[A]merican courts have interpreted 'exercise' broadly.").

Ms. Wills contends that, at the time she removed C.K. from Germany in October 2007, Mr. Krefter was not actually exercising his rights. She asserts that, following the explosive altercation at her apartment in June, Mr. Krefter unilaterally slashed his child support payments to 250 Euros and suspended his contact with C.K., actions which, in Ms. Wills' view, amount to "unexplainable neglect" and the non-exercise of custodial rights *under the Convention. Friedrich II,* 78 F.3d at 1066 ("[T]here may be situations when a long

period of unexplainable neglect of the child could constitute non-exercise of otherwise valid custody rights . . . ."). Mr. Krefter made no child support payments in July 2007, paid 120 Euros in August 2007, and paid only 250 Euros in September and October 2007. As for visits, after Mr. Krefter angrily left her apartment (without C.K.) on June 23, 2007, Mr. Krefter only saw C.K. once before Ms. Wills ultimately left Germany with C.K. in early October. On this occasion, Mr. Krefter did not arrange for a visit, but rather unexpectedly stopped C.K. on her way home from school one September afternoon.

However, Mr. Krefter argues that he did not "unequivocally abandon" C.K. He has demonstrated that he visited with C.K. at least seven times from March through mid-June 2007. And though he did not attempt to arrange any visits with C.K. between mid-June and her removal at the beginning of October, C.K. was staying on the Cape with Ms. Wills and her parents for at least one month of this three-and-a-half month period. In addition, in 2007 Mr. Krefter made multiple child support payments at the agreed-upon amount of 810 Euros per month and was paying some (*albeit reduced*) support at the time of C.K.'s removal. Cf. Bader, 484 F.3d at 671 (stating that the fact that the petitioner had paid child support when ordered to do so by a court might, on its own, be enough to establish that he had exercised his *custodial rights*); *Sealed Appellant,* 394 F.3d at 341, 345 (*holding, under the Friedrich II* standard, that five visits per year and payment of child support (of unclear amount and regularity) constituted exercise of custody rights).

Ms. Wills contends that these child support payments violated their agreement of 810 Euros a month; Mr. Krefter responds that they were consistent with the "Dus-

seldorf Table," which is apparently a set guideline for child support imposed by the German courts. Ms. Wills disagrees, contending that the payments were insufficient under the Dusseldorf Table. Yet, Ms. Wills, a college graduate who speaks at least some German, did not go to the German courts for protection or enforcement of child support obligations. Instead she returned to the United States with C.K.

In sum, the continued payment of some level of child support—coupled with Mr. Krefter's communication and visits with C.K. earlier in the year—vitiates any contention that Mr. Krefter *has clearly and unequivocally abandoned his custody rights.* *See Baxter,* 423 F.3d at 370 ("[T]he test for finding the non-exercise of custody rights under the Hague Convention is stringent.") (*citing Friedrich II,* 78 F.3d at 1065–66).

■ Accordingly, this Court finds that Mr. Krefter has demonstrated, by a preponderance of the evidence, that he was actually exercising his custody rights at the time of removal in October 2007. For the same reason, Ms. Wills has not established a defense under Article 13.

**B. Grave Risk of Harm**

Ms. Wills also contends that this Court should not order C.K.'s return to Germany because, if returned, C.K. would face a "grave risk" of harm or be placed in an intolerable situation. She contends that if she returned to Germany with C.K. to face a protracted custody proceeding, she would have no way to support herself and C.K., and they would end up homeless or living in an equally intolerable situation in Germany.

■ One of four exceptions or defenses in the Convention, Article 13(b) provides that a court that has determined that

a wrongful removal has occurred is not bound to order the return of that child if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, art. 13(b). Implementing federal legislation requires that a party opposing return based on this exception must establish the *defense by clear and convincing evidence.* *Danaipour v. McLarey,* 286 F.3d 1, 13 (1st Cir.2002) (citing 42 U.S.C. § 11603(e)(2)(A)). Like all exceptions in the Convention, Article *13(b) is to be construed narrowly. Id.* "[W]hen determining whether a grave risk of harm exists, courts must be attentive to *the purposes of the Convention." Walsh v. Walsh,* 221 F.3d 204, 218 (1st Cir.2000). Accordingly, although the inquiry involves *determinations about the situation a child may return to, id.* at 219, this exception "may not be used 'as a vehicle to litigate (*or relitigate*) the child's best interests.' " *Danaipour,* 286 F.3d at 14 (quoting Hague International Child Abduction Convention: Text and Legal Analysis, 51 Fed.Reg. 10,-494, 10,510 (Dep't of State Mar 26, 1986)).

■ The bar for proving the "grave risk" exception is set exceptionally high. As stated in the State Department's Legal Analysis, 51 Fed.Reg. at 10,510, "[t]he person opposing the child's return must show that the risk to the child is grave, not *merely serious." Simcox v. Simcox,* 511 F.3d 594, 605 (6th Cir.2007) (*quoting Friedrich II,* 78 F.3d at 1068). "[T]he harm must be a great deal more than minimal.... Not any harm will do *nor may the level of risk of harm be low." Walsh,* 221 F.3d at 218 (but noting that the risk need not be "immediate") (internal *citation omitted*); *see Friedrich II,* 78 F.3d at 1069 (finding that the grave risk exception only applies when the child is in "danger *prior* to the resolution of the cus-

tody dispute—e.g., returning the child to a zone of war, famine, or disease .... [or when] there is a grave risk of harm in cases of serious abuse *or neglect, or extraordinary emotional dependence*"). *See generally Ellen L. Buckwalter, In the Best Interest of the Child,* Berkeley Electronic Press (Working Paper 1166 at 13) (2006), http:/law.bepress.com/expresso/eps/1166 (stating that, as of January 2006, courts in the United States had found the "grave risk" of harm standard satisfied in only ten out of forty-nine invocations of the defense).

As a court in this district recently observed,

> [First Circuit cases] that have approved invocation of the Article 13(b) exception have focused on evidence of a sustained pattern of physical abuse and/or a propensity for violent *abuse. See, e.g., Walsh,* 221 F.3d at 219–220 (finding grave risk of harm where petitioner had severely beaten his wife over a number of years, including while she was pregnant, many of the beatings took place in front of her small children, and petitioner had a history of other violent activity and of chronic disobedience of *court orders*); *see also Danaipour v. McLarey,* 386 F.3d 289 (1st Cir.2004) (affirming district court finding of grave risk of psychological harm where petitioner had sexually abused one of the two children whose return was sought). Evidence of real but sporadic or isolated incidents of physical abuse, or of some limited incidents aimed at persons other than the child at issue, have not been found sufficient to support application of the "grave risk" exception. *See Whallon,* 230 F.3d at 460 (finding that allegations of physical and verbal abuse did not rise to the level needed to satisfy the Article 13(b) exception and stating that "[t]o conclude otherwise would risk substituting a best

interest of the child analysis for the analysis the Convention requires").

*McManus v. McManus,* 354 F.Supp.2d 62, 70 (D.Mass.2005); *see also Simcox,* 511 F.3d at 607 (finding, after a survey of cases from various circuits, that "relatively minor" abuse is "unlikely" to satisfy the "grave risk" standard). Significantly, here, Ms. Wills makes no allegations that Mr. Krefter ever abused her or C.K.

■ Instead, Ms. Wills contends that, because C.K. is "emotionally dependent" on Ms. Wills, has been enrolled in school in Mashpee since October 2007, and has "flourished" since she began living with her mother and grandparents in Mashpee, she will "face certain psychological harm" if forced to return to Germany. (Resp't Post–Hr'g Mem. 12.) However, "the mere fact that removal would unsettle ... children who have now settled in the United States" is generally insufficient, on its own, to *establish a grave risk of harm. Walsh,* 221 F.3d at 220 n. 14 (characterizing such disruption as "an inevitable consequence of *removal*"). *But cf. Blondin v. Dubois,* 238 F.3d 153, 164–65 (2d Cir.2001) (stating that a district court may consider evidence that a child is now settled in a new environment "as part of an analysis under Article 13(b) as long as that factor is not the sole basis for a finding that there is clear and convincing *evidence that a grave risk of harm exists*"); *Kufner v. Kufner,* 480 F.Supp.2d 491, 509 (D.R.I.2007) ("[A] finding that a child is settled may form part of a broader analysis of whether repatriation will create a grave risk of harm.") (internal *quotation marks omitted*), *aff'd,* 519 F.3d 33 (1st Cir.2008).

■ Ms. Wills also emphasizes that she was unable to support herself and C.K. when previously living in Germany and there is little prospect of her succeeding in doing so were she to return with C.K. in the coming months. Generally speaking, a

mere shortage of money is not, on its own, sufficient to establish an *"intolerable situation."* *See* Hague International Child Abduction Convention: Text and Legal Analysis, 51 Fed.Reg. at 10,510 ("A review of deliberations on the Convention reveals that 'intolerable situation' was not intended to encompass return to a *home where money is in short supply.*"); *see also Blondin,* 238 F.3d at 162; *Friedrich II,* 78 F.3d at 1068–69. The test for establishing a "grave risk of harm" defense is undeniably *stringent. See Simcox,* 511 F.3d at 608 (noting that "the 'grave risk' threshold is necessarily a high one," but warning that "there is a danger in making the threshold so insurmountable that district courts will be unable to exercise any discretion in all but the most egregious cases of abuse"). Ms. Wills simply has not satisfied this exceedingly high standard.

Still, this Court need not turn a blind eye to a very real potential for harm upon a child's return. Currently indigent, Ms. Wills has little prospect of supporting herself and C.K. were she to return to Germany in the coming months. There is, therefore, a great risk of harm to C.K. unless Mr. Krefter undertakes to provide for the financial security of both Ms. Wills and C.K. during the course of custody proceedings in Germany. Moreover, Mr. Krefter has, in the past, unilaterally cut or reduced child support payments as a means of punishing or attempting to force Ms. Wills into submission after a disagreement.

As evidenced both by the behavior recounted above and his behavior during these proceedings, Mr. Krefter is a very secretive individual who appears to desire being in control at all times. Throughout much of his testimony during the hearing, Mr. Krefter was hostile, refusing to answer even straightforward questions, often with no discernable reason for doing so. For example, when asked by his attorney where he resided in Germany, Mr. Krefter responded that his address was 33 Postrasse in Hamburg, Germany. It was only after much prodding by Ms. Wills' counsel and several angry outbursts by Mr. Krefter that Mr. Krefter reluctantly admitted that the 33 Postrasse address was not where he slept at night, but rather a business address where he received mail.

Mr. Krefter also has anger management problems. On several occasions during his testimony, this Court had to warn Mr. Krefter to calm down and get control of himself, even providing a break in proceedings to allow him to do so. When asked on cross-examination about files he brought with him to the proceeding, Mr. Krefter— without any basis—accused Ms. Wills' counsel of going through Mr. Krefter's file during a previous day of testimony. In addition, after a routine evidentiary ruling during Ms. Wills' testimony, Mr. Krefter stormed out of the courtroom in anger.

■ Courts considering petitions for return under the Convention have the authority to impose conditions, known as undertakings, to ensure that a potential harm "does not manifest" when a child *returns to his or her country of habitual residence. Kufner,* 480 F.Supp.2d at 515 n. 34 ("[W]here the potential for harm is real, even if it does not meet the Article 13(b) definition, [a court] ... has an obligation to attempt to ensure that it does not *manifest.*"), *aff'd,* 519 F.3d 33, 41 (upholding conditions imposed *by district court on child's return* ); *see also Feder v. Evans–Feder,* 63 F.3d 217, 226 (3d Cir.1995) (instructing a district court that, in the event it concludes that a mother's Article 13(b) defense falls short but that "an unqualified return order would be detrimental" to the child, "the court should investigate the adequacy of undertakings ... to ensure that [the child] does not suffer shortterm harm"). Undertakings are "a type of safe-

guard that courts may impose in order to help ensure that a *potential risk of harm does not materialize.*" *Kufner*, 480 F.Supp.2d at 513; *see Danaipour*, 286 F.3d at 21 ("Undertakings can be an important tool for courts to comply with the Convention's strong presumption of a safe and speedy return of a wrongfully *removed child.*"); *Walsh*, 221 F.3d at 219.

 A prolonged separation from Ms. Wills would be very detrimental to C.K. There is a grave risk that Mr. Krefter will not provide reasonable financial resources to Ms. Wills upon her return to Germany. In fact, Mr. Krefter ceased making child support payments once the hearing before this Court concluded. To ensure that C.K. and her mother do not live in intolerable financial conditions in Germany until the German court has the opportunity to resolve this acrimonious situation, this Court will require, as conditions for her return, that Mr. Krefter pay for airplane tickets for C.K. and Ms. Wills to return to Germany, procure and pay for housing for Ms. Wills and C.K. in advance of their departure, and pay three months of child support at the mutually agreed upon amount of 810 Euros before their departure. *Cf. Danaipour*, 286 F.3d at 22 (listing "an agreement that the abducting parents return to the country of habitual residence with the child" and "assignment of costs for the return flight" as examples of undertakings deemed "appropriate" by the U.S. Department of State). In addition, both Ms. Wills and Mr. Krefter should use reasonable efforts to schedule court proceedings so as to require minimal disruption to C.K.'s schooling.

These conditions are "limited in scope and further the Convention's goal of ensuring the prompt return of the child to the jurisdiction of habitual residence, so that the jurisdiction *can resolve the custody dispute.*" *Danaipour*, 286 F.3d at 22 (in-

ternal quotation marks omitted). They do not require any action or enforcement by foreign courts and thus do not raise any *concerns of international comity. Compare Danaipour*, 286 F.3d at 25 (reversing district court's conditional return order because it "offended notions of international comity under the Convention by issuing orders with the expectation that the [foreign] courts *would simply copy and enforce them*") *with Kufner*, 519 F.3d at 41 (concluding that undertakings which required petitioner, but not foreign courts, to take action did not offend notions of international comity and affirming district court's conditional order of return).

## IV. ORDER

The Court *ALLOWS* the petition subject to the following undertakings:

(1) Mr. Krefter pay for airplane tickets to Germany for C.K. and Ms. Wills in advance of their departure from the United States;

(2) Mr. Krefter pay Ms. Wills three months of child support at the agreed upon amount of 810 Euros per month before Ms. Wills and C.K. depart the United States;

(3) Mr. Krefter procure suitable housing for Ms. Wills and C.K. in Germany which will be affordable at 810 Euros per month;

(4) Both parents shall use reasonable efforts to schedule court proceedings forthwith in Germany so as to require minimal disruption to C.K.'s schooling; and

(5) Ms. Wills shall return to Germany with C.K. as soon as these conditions are met.